**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, )<br><br>    Plaintiff, )<br><br>      v. )<br><br>SHORENSTEIN REALTY SERVICES, L.P.; SHORENSTEIN MANAGEMENT, INC.; SHORENSTEIN COMPANY, LLC; SRI MICHIGAN VENTURE, LLC; SRI MICHIGAN AVENUE MANAGEMENT, INC.; 175 EAST DELAWARE PLACE HOMEOWNERS ASSOCIATION; and NATIONAL UNION FIRE INSURANCE OF PITTSBURGH, PA, )<br><br>    Defendants. ) | No. 07 C 3179 |

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA; SRI MICHIGAN AVENUE
VENTURE, LLC; SHORENSTEIN REALTY
SERVICES, L.P.; SHORENSTEIN MANAGEMENT,
INC.; SRI MICHIGAN AVENUE MANAGEMENT,
INC.; and SHORENSTEIN COMPANY, LLC,

    Defendants/Counter-Plaintiffs,

      v.

UNITED STATES FIDELITY AND GUARANTY
COMPANY,

    Plaintiff/Counter-Defendant.

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA; SRI MICHIGAN AVENUE
VENTURE, LLC; SHORENSTEIN REALTY
SERVICES, L.P.; SHORENSTEIN MANAGEMENT,
INC.; SRI MICHIGAN AVENUE MANAGEMENT,
INC.; and SHORENSTEIN COMPANY, LLC,

    Defendant/Third Party Plaintiffs,

      v.

AMERICAN MOTORISTS INSURANCE COMPANY,

    Third Party Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

This is a declaratory judgment action arising in connection with an accident that occurred during a restoration effort known as the "Curtain Wall Project" ("the project") at Chicago's John Hancock Center (the "Hancock Center"). On March 9, 2002, a scaffolding fell from outside the forty-second floor of the Hancock Center, killing or injuring several individuals on the street below. Multiple lawsuits were filed in Illinois state court seeking to hold various parties responsible for the accident. Among the parties sued were Shorenstein Realty Services, LP ("Shorenstein")[1] and 175 East Delaware Place Homeowner's Association ("the Homeowner's Association"), two of the entities that own, operate, and control the Hancock Center.

Shorenstein and the Homeowner's Association were named as additional insureds on policies issued by United States Fidelity and Guaranty Company ("USF&G"). When they approached USF&G seeking a defense, however, USF&G refused. As a result, Shorenstein was represented in the underlying litigation by National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), and the Homeowner's Association was represented by Mt. Hawley Insurance

---

[1] Also named as defendants were several other Shorenstein entities: Shorenstein Management, Inc., Shorenstein Company, LLC, SRI Michigan Avenue Venture, LLC, and SRI Michigan Avenue Management, Inc. With one exception discussed below, *see infra* II.B.4, it is unnecessary for purposes of this order to distinguish between these entities. Hence, unless otherwise indicated, I refer to them collectively as "Shorenstein."

Company ("Mt. Hawley").  Shorenstein was also named as an additional insured on a separate policy issued by American Motorists Insurance Company ("AMICO").  Shorenstein tendered its defense to AMICO; like USF&G, however, AMICO refused.

The underlying suits were eventually consolidated and settled. National Union paid roughly 7.7 million toward the settlement; Mt. Hawley claims that it contributed $1 million.[2]  USF&G filed this action seeking a declaration that Shorenstein and the Homeowner's Association are not covered under their respective USF&G policies, and that USF&G has no duty to indemnify National Union and Mt. Hawley for the amounts they spent in settling the underlying suits. In turn, National Union and Mt. Hawley have filed counterclaims against USF&G, asserting that Shorenstein and the Homeowner's Association are covered under the USF&G policies.  In addition, National Union filed a third-party complaint against AMICO, arguing that Shorenstein was entitled to coverage under AMICO's policy, and that National Union is entitled to equitable subrogation from AMICO.

All of the opposing parties have filed cross-motions for

---

[2] In March 2009, I granted the parties' joint motion to bifurcate the proceedings into an initial phase addressing issues of coverage, and a second phase addressing issues of damages. *See* Minute Order 3/10/09 (Doc. 149).  The current motions belong to the first of these phases.  Consequently, the issue of damages is not addressed in this order.  Thus, while USF&G appears to dispute the precise amount of Mt. Hawley's contribution to settling the underlying litigation, *see* USF&G Resp. to Mt. Hawley L.R. 56.1 Stmt. (Doc. 193) ¶ 34, this ultimately concerns the issue of damages and need not be resolved at this time.

summary judgment against one another. In particular, currently before me are cross-motions for summary judgment between: (1) USF&G and National Union; (2) USF&G and Mt. Hawley; and (3) National Union and AMICO.[3] For the reasons discussed below, I grant National Union's motion for summary judgment and deny USF&G's cross-motion; I grant USF&G's motion and deny Mt. Hawley's cross-motion; and I grant National Unions's motion and deny AMICO's cross-motion.

## I. Legal Standard

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts must be construed in the light most favorable to the non-movant, and all justifiable inferences must be drawn in the non-movant's favor. *Id.* at 255. "When ruling on cross-motions for summary judgment, the court evaluates each party's motion separately and on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration." *Taylor Chrysler Dodge,*

---

[3] Although Shorenstein and the Homeowner's Association are also listed as defendants/counter-plaintiffs to the motions, for convenience, I refer to the parties by the names of their respective insurance companies.

*Inc. v. Universal Underwriters Ins. Co.*, No. 08 C 4522, 2009 WL
3187234, at *3 (N.D. Ill. Sept. 30 2009); *see also Mote v. Aetna
Life Ins. Co.*, 502 F.3d 601, 606 (7th Cir. 2007). "Under Illinois
law, the interpretation of an insurance policy is a question of law
that is properly decided by way of summary judgment." *Twenhafel v.
State Auto Prop. & Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009)
(quotation marks omitted); *see also DeSaga v. West Bend Mut. Ins.
Co.*, 910 N.E.2d 159, 163 (Ill. App. Ct. 2009).[4]

## II.    Discussion

### A.    Interpretation of Insurance Policies Under Illinois Law

The facts at issue in each of the motions for summary judgment
are largely undisputed.    The parties' arguments for summary

---

[4] In their briefing, USF&G, National Union, and Mt. Hawley do
not engage in a choice-of-law analysis.  Rather, they assume that
Illinois law governs their disputes.  *See, e.g.*, *U.S. Fidelity and
Guar. Co. v. Shorenstein Realty Servs., LP*, 591 F. Supp. 2d 966,
968 n.2 (N.D. Ill. 2008)(noting the parties' agreement on the
application of Illinois law).  AMICO suggests the possibility that
California law might apply to its dispute with National Union.
Nevertheless, AMICO relies on Illinois law in its briefing and
maintains that there are no important differences between
California and Illinois law for purposes of the instant motions.
*See* AMICO Mem. Support Mot. Summ. J. (Doc. 173) at 8 n.3.  Since
none of the parties challenges the application of Illinois law, I
shall apply Illinois law as well.  *See, e.g.*, *Wood v. Mid-Valley
Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is
that when neither party raises a conflict of law issue in a
diversity case, the federal court simply applies the law of the
state in which the federal court sits . . . .  With the principal
exception of issues going to the subject-matter jurisdiction of the
federal courts, these courts are not required to and ordinarily do
not create issues where the parties agree."); *Wehrs v. Benson York
Group, Inc.*, No. 07 C 3312, 2008 WL 753916, at *2 (N.D. Ill. Mar.
18, 2008) (applying New York law where both parties assumed that
New York law applied).

judgment turn almost entirely on legal questions concerning the proper interpretation of the relevant insurance policies. The Illinois Court of Appeals recently provided a compendious summary of the guiding principles to be followed in interpreting insurance policies under Illinois law:

> When interpreting an insurance policy or any other contract, the primary goal is to give effect to the intent of the parties as expressed in the agreement. If the terms of an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning and enforced as written, unless to do so would violate public policy. Insurance policies are to be liberally construed in favor of the insured, and in favor of coverage. Any ambiguity that exists in the language of a policy must be resolved against the insurer, since the insurer drafted the policy. In addition, any provision in a policy that limits or excludes coverage must be construed liberally in favor of the insured and against the insurer.

*DeSaga*, 910 N.E.2d at 163-64 (citations omitted).

With this framework in view, I now turn to the parties' cross-motions for summary judgment. The insurance policies at issue in each of the motions are largely the same. As a result, similar questions and arguments are presented in each of the motions. Nevertheless, I consider each of the disputes separately in what follows.

**B.    USF&G & National Union**

I first examine the cross-motions for summary judgment between USF&G and National Union. In 2002, Shorenstein and the Homeowner's Association hired Eckland Consultants, Inc. ("Eckland"), an architectural and engineering firm, to oversee the Curtain Wall

restoration project at the Hancock Center.  The parties' agreement required Eckland to obtain an insurance policy that named Shorenstein and the Homeowner's Association as additional insureds under the policy.  Eckland obtained such a policy from USF&G ("the USF&G Policy").  The dispute between USF&G and National Union centers on a provision of the USF&G Policy that excludes coverage for professional services.  In relevant part, the provision states:

> 2.  Exclusions Applicable to the Liability Coverage
>
> This insurance does not apply to:
>
> 1.  Professional Services.
>
> > "Bodily injury," "property damage," "personal injury" or "advertising injury" due to rendering or failing to render any professional services by or on behalf of any insured.  Professional services includes:
> >
> > (1) Legal, accounting, advertising, real estate, travel, consulting or architectural services;
> > (2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications;
> > (3) Supervisory, claim, investigation adjustment, appraisal, survey, audit, inspection or engineering services.

USF&G Policy, USF&G L.R. 56.1 Stmt., Ex. A (Doc. 163-1) at 6.

In addition to the professional services exclusion, the USF&G Policy was subject to two important endorsements: a "Broadened Endorsement" and a "Blanket Endorsement."  Among other things, the Broadened Endorsement provides:

> E.  Additional Insured Exclusions

1. In addition to the other exclusions applicable to COVERAGES A., B., and C., the insurance provided to an Additional Insured does not apply to:

    b. "Bodily injury," "property damage," "personal injury," or "advertising injury" which is not caused in whole or in part by the negligent acts or omissions of any Named Insured, or the negligent acts or omissions of anyone directly or indirectly employed by a Named Insured or for whose acts a Named Insured may be liable.

Broadened Endorsement, National Union L.R. 56.1 Stmt., Ex. C-2 (Doc. 166). In relevant part, the Blanket Endorsement states:

1. If:

    (a) you are required to add another person or organization as an insured under this policy in a written construction contract or agreement which is in effect during the period of this policy; and

    (b) a certificate of insurance has been issued listing that person as an ADDITIONAL INSURED, the WHO IS AN INSURED (SECTION II) is amended to include that person or organization as an insured (referred to below as an ADDITIONAL INSURED).

2. In addition to the other exclusions applicable to COVERAGES A., B., AND C., the insurance provided to an ADDITIONAL INSURED does not apply to:

    b. "Bodily injury," "property damage," "personal injury," or "advertising injury" arising out of an architect's, engineer's or surveyor's rendering or failure to render any professional services for you, for the ADDITIONAL INSURED, or for others, including:

        (1) The preparing, approving, or failure to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or
        (2) Supervisory, inspection, or engineering services.

    c. "Bodily injury," "property damage," "personal injury," or "advertising injury" which is not

> caused in whole or in part by the negligent acts or
> omissions of any Named Insured, or the negligent
> acts or omissions of anyone directly or indirectly
> employed by a Named Insured or for whose acts a
> Named Insured may be liable.

Blanket Endorsement, National Union L.R. 56.1 Stmt., Ex. C-1 (Doc. 166).

Following the Hancock Center accident, USF&G refused Shorenstein's claim that the USF&G Policy required USF&G to provide it with a defense in the underlying lawsuits, citing the Policy's professional services exclusion. Specifically, USF&G maintained that since the accident arose from Eckland's performance of professional services, the USF&G Policy afforded Shorenstein no coverage in connection with the resulting lawsuits. In their cross-motions for summary judgment, USF&G and National Union join issue over three questions: (1) whether Shorenstein, as an additional insured, is subject to the USF&G Policy's professional services exclusion; (2) whether, assuming *arguendo* that Shorenstein is subject to the exclusion, the provision is applied based on Eckland's performance of professional services or on Shorenstein's own performance of professional services; and (3) whether, assuming *arguendo* that the exclusion is applied based on Eckland's performance of professional services, the USF&G Policy necessarily leaves Shorenstein without coverage for the underlying suits.

While I am not convinced by National Union's arguments with respect to the first and third issues, I am persuaded by its argument concerning the second, and I accordingly conclude that

National Union is entitled to summary judgment.

### 1. Whether Shorenstein is Subject to the Professional Services Exclusion as an Additional Insured

National Union begins at the threshold by raising the question of whether the professional services exclusion can even be applied to Shorenstein. National Union argues that the exclusion cannot be applied to Shorenstein because Shorenstein is designated as an "additional insured" under the USF&G Policy, and the exclusion applies only to "insureds." In support of its claim, National Union points to language in the Broadened Endorsement, which, according to National Union, provides that "a person or organization required to be added by contract becomes part of the WHO IS AN INSURED section of the liability coverage part, but 'Such person or organization is referred to in this Coverage Part as an Additional Insured.'" National Union Mem. Support Summ. J. against USF&G (Doc. 165) at 5 (quoting Broadened Endorsement).

This interpretation of the Policy is exceedingly strained. Notably, National Union quotes only the final sentence of the clause on which it relies. The full provision reads as follows:

> If you are required to add another person or organization as an insured under this policy by a written work contract or agreement which is in effect during the policy period and a certificate of insurance has been issued listing that person or organization as an Additional Insured, *that person or organization is an insured.* Such person or organization is referred to in this Coverage Part as an Additional Insured.

Broadened Endorsement ¶ 3(i) (emphasis added). This provision makes clear that an "Additional Insured" is also an "insured" under

the Policy.  Thus, "insured" and "additional insured" are not mutually exclusive designations; rather, additional insureds represent a subclass within the universe of insureds.  As the preface to the Liability Coverage Part further explains, "[t]he word 'insured' means any person or organization qualifying as such under SECTION II -- WHO IS AN INSURED."  USF&G Policy at 1.  In other words, as an additional insured, Shorenstein qualifies as an insured under Section II of the Policy.  The professional services exclusion applies to "any insured"; it makes no distinction between, or exception for, insureds who also happen to be additional insureds under the Policy.  Accordingly, Shorenstein is subject to the professional services exclusion.

National Union goes on to point out, however, that while the USF&G Policy and the Blanket Endorsement contain the professional services exclusion, the Broadened Endorsement does not.  According to National Union, the Broadened Endorsement's omission of the exclusion has the effect of deleting the exclusion from the Policy.  National Union contends that the Broadened Endorsement supersedes the Blanket Endorsement because "[t]he Broadened Endorsement provides the broader coverage and is the applicable endorsement, as courts resolve ambiguities or conflicts in insurance policies through liberal construction in favor of coverage."  National Union Mem. in Support Mot. for Summ. J. against USF&G (Doc. 164) at 4.

I disagree.  Quite simply, nothing in the endorsements, or in the Policy itself, suggests that either endorsement was intended to

be given priority over the other. National Union argues that if "USF&G intended to exclude professional services in the Broadened Endorsement, it could have used the more specific language of Exclusion 2.b. of the Blanket Endorsement." *Id.* at 7. But this again assumes that one of the endorsements must replace the other. If both endorsements apply to the Policy, it would be unnecessary to include the professional services exclusion in the Broadened Endorsement, since the exclusion is already contained in the Blanket Endorsement and the Policy.

Against this, however, National Union contends since both the Policy and the Blanket Endorsement contain the professional services exclusion, the parties could not have contemplated that the exclusion in the Policy would apply to additional insureds such as Shorenstein. After all, National Union argues, if the Policy's professional services exclusion had been intended to apply to additional insureds, there would have been no reason to add the exclusion in the Blanket Endorsement.

This argument fails to take account of the particular purpose and nature of the Policy and endorsements at issue in the case. The USF&G Policy is a commercial general liability policy. As such, it is not intended to provide coverage to architects and engineers such as Eckland for liability arising specifically out of their performance of professional services. For risk of the latter sort, providers of professional services obtain separate coverage

under a professional liability policy.[5]  It is precisely for this reason that general liability policies contain professional services exclusions.  It is also important to note, as USF&G points out, that the Blanket and Broadened Endorsements apply differently to different kinds of policies.  The Blanket Endorsement, for example, can be endorsed to general liability policies, which contain professional services exclusions, as well as professional liability policies, which obviously do not contain such exclusions.  *See* USF&G Resp. to USF&G (Doc. 197) at 9-10. Since the underlying policy being endorsed by the Blanket Endorsement may or may not include a professional services exclusion, it is necessary to include the provision in the Blanket Endorsement.  The Broadened Endorsement, on the other hand, applies specifically to architects and engineers, and is endorsed only to general liability policies.  Because general liability policies already contain a professional services exclusion, it is unnecessary to add the exclusion to the Broadened Endorsement.  Thus, the fact that the professional services exclusion is found in both the Policy and in the Blanket Endorsement provides no basis for thinking that the exclusion contained in the Policy was not intended to apply to additional insureds such as Shorenstein.

A final problem with National Union's position is that in some cases, National Union itself uses the terms "additional insured"

_____

[5] Eckland had a separate professional liability policy.  *See* USF&G Resp. to National Union L.R. 56.1 Stmt., Ex. C (Doc. 195-4).

-13-

and "insured" interchangeably.  As USF&G points out, for example, National Union concedes that Shorenstein is an insured -- and not an additional insured -- for purposes of the Policy's "Separation of Insureds" provision.  As will become clear below, National Union relies on the Separation of Insureds provision in advancing other of its arguments for summary judgment.  The Separation of Insureds provision, however, mentions only "insureds" and makes no reference to "additional insureds."  If Shorenstein were to be regarded exclusively as an additional insured, therefore, National Union's own arguments would be non-starters.

Based on these considerations, I am unpersuaded by National Union's argument that Shorenstein, by virtue of its status as an additional insured, is not subject to the USF&G Policy's professional services exclusion.

### 2. Whether the Professional Services Exclusion Applies to Shorenstein's Own Conduct or to Eckland's

National Union next argues that even if Shorenstein is subject to the professional services exclusion, Shorenstein remains covered under the Policy because the Policy's terms must be applied separately to Shorenstein and Eckland.  In other words, under National Union's interpretation, the question is not whether *Eckland* performed professional services but whether *Shorenstein* did so.  As National Union points out, Shorenstein is not alleged to have performed professional services in connection with the Curtain Wall project.  Rather, the underlying lawsuits claimed that

Shorenstein had been negligent in its duties as co-owner of the Hancock Center. Thus, for example, the causes of action alleged against Shorenstein included negligence, premises liability, negligent infliction of emotional distress, and loss of consortium. *See* National Union Reply (Doc. 215) at 11. Since Shorenstein did not render professional services of any kind, it follows that Shorenstein is not excluded from coverage under the Policy. I agree.

National Union's argument is based on the Policy's "Separation of Insureds" clause, which provides:

**SECTION IV - CONDITIONS**

7. Separation of Insureds

Except with respect to the Limits of Liability, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:
a. As if each Named Insured were the only Named Insured; and
b. Separately to each insured against whom claim is made or "suit" is brought.

USF&G Policy at 17.

National Union's interpretation clearly accords with the provision's plain language. On a straightforward reading, the Separation of Insureds clause indicates that the Policy's provisions should be applied to Shorenstein independently of Eckland. National Union's interpretation draws further support from the fact that under USF&G's rival interpretation, Shorenstein's coverage is rendered virtually illusory. This is because, as already noted, Eckland was hired essentially to perform

-15-

only professional services.  Hence, if Shorenstein is not covered for injuries arising out of Eckland's professional services, the Policy appears to provide Shorenstein without any protection for Eckland's conduct at all.  As National Union correctly points out, illusory insurance is disfavored under Illinois law.  *See, e.g.*, *Sears, Roebuck & Co. v. Reliance Ins. Co.*, 654 F.2d 494, 499 (7th Cir. 1981); *Murray Ohio Mfg. Co. v. Cont'l Ins. Co.*, 705 F. Supp. 442, 444 (N.D. Ill. 1989).

USF&G raises several arguments against National Union's interpretation, but none of these is convincing.  USF&G first argues that the Policy "expressly limits additional insured coverage to acts or omissions arising out of Eckland's work." USF&G Resp. (Doc. 197) at 3.  USF&G bases this contention on the Additional Insureds provision, which is found in both the Broadened and the Blanket endorsements to the Policy:

> In addition to the other exclusions applicable to COVERAGES A, B, and C, the insurance provided to an ADDITIONAL INSURED does not apply to . . .
>
> "Bodily injury," "property damage," "personal injury," or "advertising injury" which is not caused in whole or in part by the negligent acts or omissions of any Named Insured, or the negligent acts or omissions of anyone directly or indirectly employed by a Named Insured or for whose acts a Named Insured may be liable.

Blanket Endorsement ¶ 2.c.; Broadened Endorsement ¶ 1.E.1.b.  USF&G goes on to argue that since additional insureds are covered only for acts or omissions arising out of Eckland's work, and since Eckland's work consisted entirely of professional services, and

since Shorenstein is not covered for injuries arising out of the performance of professional services, Shorenstein is not covered under the Policy for the suits underlying the instant action.

The Additional Insureds clause cannot plausibly be interpreted to mean, as USF&G insists, that additional insureds are covered only for acts or omissions arising out of Eckland's work. On the contrary, the plain language of the provision precludes coverage that is not caused "in whole or in part" by the negligent acts or omissions of any named insured. In other words, the provision merely says that additional insureds are not covered for personal or bodily injuries unless those injuries were at least partially caused by Eckland's acts. Nothing in the clause requires that Eckland be the *sole* cause of the injuries at issue. Hence, Shorenstein's coverage is not restricted to liability arising solely from Eckland's conduct.

USF&G also argues that National Union's interpretation of the Policy must be rejected because it is commercially unreasonable. Thus, USF&G argues that it "is illogical for USF&G, a general liability carrier, to exclude coverage for liability arising from the professional services of its named insured [a risk insured by errors and omissions policies], but to cover liability for professional errors by or on behalf of additional insureds, about whom USF&G knows little to nothing." USF&G Resp. at 5. "Such an interpretation," USF&G argues, "would convert the additional insured coverage of the USF&G general liability policy into

professional liability coverage." *Id.* Still further, USF&G points to the premiums charged for the Policy as evidence that it could not have been intended to provide the kind of coverage alleged by National Union. *Id.* at 10-11. In particular, USF&G claims that the premium under Eckland's general liability policy was $7,453 for $1 million in primary coverage and $3,200 for $5 million umbrella coverage; in contrast, the premium for Eckland's professional liability policy was $209,347 for $3 million in coverage.[6] USF&G claims that it would have charged a much higher premium if the Policy had been intended to provide the extensive coverage proposed by National Union.

For several reasons, I am not persuaded. As an initial matter, courts have emphasized that "commercial unreasonableness" should be invoked as a principle of construction only with great reticence. This is because, as Judge Posner has emphasized, "there is always a danger that what seems commercially unreasonable to a court did not seem so to the parties." *XCO Intern. Inc. v. Pac. Sci. Co.*, 369 F.3d 998, 1005 (7th Cir. 2004); *see also Geneva Intern. Corp. v. Petrof, Spol, S.R.O.*, 608 F. Supp. 2d 993, 1003 (N.D. Ill. 2009) ("It is not the court's role to alter a contract where the parties have shown 'poor judgment.'").

Nor is it clear that National Union's interpretation of the

---

[6] It appears that the actual coverage limit is $5 million for all claims, and that $3 million is the limit for each individual claim. *See* USF&G Resp. to Mt. Hawley Rule 56.1 Statement, Ex. C (Doc. 193-4) at NU000010212.

Policy is as commercially unreasonable as USF&G urges. For example, USF&G claims that it would have made no sense for it to cover Shorenstein for professional services but not Eckland. But the parties do not appear to have contemplated that Shorenstein would provide any professional services in connection with the project. If that were so, USF&G would not be assuming a substantial risk in covering Shorenstein for liability arising out of its rendering of professional services.

Even putting this consideration to one side, it remains unclear whether the premiums charged by USF&G are so modest that the Policy could not reasonably be construed as covering professional liability for Shorenstein. Making an assessment on this point is difficult because the parties do not address it at length. In its reply brief, National Union claims that the coverage for additional insureds was "built in" to the original agreement and that, as a result, there was no need for USF&G to charge an additional premium. National Union Reply at 14. n.1-n.2. In any event, even viewing the matter in the light most favorable to USF&G, the premiums charged are not so far from the norm as to render National Union's interpretation untenable. This is not a case, for instance, where the "interpretation makes *no* economic sense," *Dispatch Automation, Inc. v. Richards*, 280 F.3d 1116, 1119 (7th Cir. 2002) (emphasis added), or is "so plainly unreasonable as to justify [the] holding that it is to be rejected altogether," *Outlet Embroidery Co. v. Derwent Mills*, 254 N.Y. 179, 185 (1930)

(Cardozo, C.J.).

Additionally, it should be noted that the charge of commercial unreasonableness cuts both ways: even assuming that National Union's interpretation of the Policy leads to commercially unreasonable results, USF&G's interpretation leads to consequences that appear at least as commercially unreasonable. As noted above, under USF&G's interpretation, Shorenstein's coverage under the Policy is virtually nil. USF&G concedes that its interpretation leaves Shorenstein with very little coverage under the Policy. Nevertheless, USF&G insists that the coverage would not be illusory because it is at least conceivable that Eckland would be sued for certain kinds of non-professional conduct covered by the general policy. As an example, USF&G suggests a case in which "Eckland left a piece of equipment at the Hancock Center over which a visitor to the building tripped and fell, injuring himself[.]" USF&G Resp. at 13. USF&G explains that in such a case the individual "would likely sue both Eckland and the Hancock Center's owner and building management," and that such a claim "is a general liability claim and the owner and management company would have coverage as additional insureds." *Id.*

The problem with USF&G's example, as National Union points out, is that it bears a very strong resemblance to the incident giving rise to this case. The injuries at issue in the underlying suits were caused by equipment allegedly left behind by Eckland. Of course, the equipment involved here -- the scaffolding -- was

not left on the ground to be stumbled over; it was left dangling from the side of the Hancock Center, where it was blown loose by high winds and fell on individuals below.  In all relevant respects, however, the two scenarios are the same.  It is not clear why coverage would be allowed under USF&G's hypothetical, but not under the facts of the present case.  USF&G makes no attempt to provide an answer.

Moreover, National Union's interpretation is supported by Judge Conlon's decision *City of Chicago v. St. Paul Fire & Marine Ins. Co.*, No. 97 C 5756, 1998 WL 111564 (N.D. Ill. Mar. 11, 1998), one of the few cases involving facts and issues similar to those in question here.  In *City of Chicago*, Globetrotters Engineering Company ("GEC") was hired as a subcontractor to supervise construction of the Chicago Skyway Project.  *Id.* at *1.  The City was named as an additional insured on a policy issued to GEC by St. Paul Fire and Marine Insurance Company ("St. Paul"), though "only as to *covered injury or damage* that results from the work done by or for GEC under the contract."  *Id.* at *2 (brackets and quotation marks omitted).  Moreover, like the USF&G Policy at issue here, the St. Paul policy included a professional services exclusion clause, which excluded coverage for "injury or damage or medical expenses that result from the performance of or the failure to perform any professional service."  *Id*.  The City was sued by a construction worker who was injured while working on the project.  *Id.* at *1.

St. Paul refused to defend the City, arguing that GEC was

hired only to provide professional services and that the policy did not cover injury resulting from the performance or the failure to perform professional services.  *Id.* at *2.  The City argued that the professional services exclusion did not apply to it because of the policy's "severability clause," which, like the USF&G Policy's Separation of Insureds provision, stated that the policy would be applied to "each protected person named in the Introduction as if that protected person was the only one named there; and separately as to each other protected person."  *Id.* at *3.  In other words, the City contended that the professional services exclusion did not bar its coverage because the City had not rendered professional services.  *Id.* at *2.  The court agreed with the City, explaining:

> Admittedly, the City's interpretation is not as elegant as St. Paul's, nor does it share the logical appeal of St. Paul's argument.  But the City's interpretation cannot be rejected out of hand.  The law accords the insured most favorable and liberal construction of exclusionary insurance provisions and the underlying complaint.  Provisions that limit or exclude coverage are to be construed most strongly against the insurer.
>
> . . . .
>
> The City creates sufficient doubt as to the applicability of the professional services exclusion to render the exclusion inapplicable as a matter of Illinois insurance law.  The St. Paul policy does not clearly rule out the possibility of the City receiving coverage where GEC is denied coverage.  True, the policy requires the covered injury or damage to result from work done by or for GEC, and GEC may have only done professional work. But the policy does not speak clearly to the situation presented here: injuries that allegedly "result from" both (1) work done by GEC and (2) the additional insured's negligence. The City presents a reasonable argument that the severability clause renders the professional services exclusion inapplicable here. At the very least, its

> applicability is not free from doubt.  Accordingly, the
> exclusion does not apply.

*Id.* at *4 (citations and alterations omitted).  As a result, the
court denied St. Paul's motion for summary judgment against the
City.  *Id.*  Precisely the same reasoning applies here.

USF&G's attempts to distinguish or otherwise cast doubt on
*City of Chicago* are not convincing.  For example, USF&G contends
that *City of Chicago* is inapposite because the policy at issue in
that case did not use the terms "insured" and "additional insured."
That is incorrect.  *See id.* at *1 (quoting a paragraph of the
policy providing that "[GEC] shall forward Certificates of
Insurance, on the City's standard Certificate of Insurance form,
which shall include [DeLeuw] and the City as an additional insured
on all categories of insurance listed herein").

USF&G also contends that the *City of Chicago* opinion was later
"vacated."  It is true that the court subsequently granted a motion
to reconsider its earlier decision and ultimately granted summary
judgment in favor of St. Paul.  *See City of Chicago v. St. Paul
Fire & Marine Ins. Co.*, No. 97 C 5756, 1998 WL 171787, at *4 (N.D.
Ill. Apr. 10, 1998) (reconsidering previous order).  However, the
grounds for reconsideration had nothing to do with the earlier
opinion's discussion of the policy's professional services
exclusion and Separation of Insureds provision.  The parties
dispute whether the first *City of Chicago* opinion was technically
"vacated" and stripped of its precedential value by the subsequent

-23-

decision.  But that issue is beside the point, because *City of Chicago* would not have been binding in this case regardless of whether the motion to reconsider had been granted.  Clearly, the salient issue is whether the opinion's reasoning was sound.  I remain persuaded that it was.

In sum, I conclude that the Policy's Separation of Insureds provision must be interpreted as requiring that the coverage of each insured or additional insured be determined separately from other insureds.  Under this interpretation, the fact that the professional services exclusion deprives Eckland of coverage under the Policy does not mean that Shorenstein, too, is without coverage.  Rather, the professional services exclusion must be applied vis a vis Shorenstein's own conduct.  When it is thus applied, Shorenstein remains covered because it did not perform professional services in connection with the project.

As a final point, I note that even if I were not entirely convinced of the correctness of National Union's interpretation, it is undeniable that National Union's is at least *one* reasonable interpretation of the Policy.  This would mean, at the very least, that the Policy was ambiguous, and as a result, I would be required under Illinois law to construe the contract against USF&G. *Twenhafel v. State Auto Prop. and Cas. Ins. Co.*, 581 F.3d 625, 628 (7th Cir. 2009) ("Where the terms of an insurance policy are clear and unambiguous, they must be applied as written; but where ambiguity exists, the terms will be strictly construed against the

-24-

drafter."); *SwedishAmerican Hosp. Ass'n of Rockford v. Ill. State Med. Inter-Ins. Exch.*, 916 N.E.2d 80, 103 (Ill. App. Ct. 2009) (any ambiguity in an insurance policy is construed against the drafter of the policy and in favor of coverage); *see also Uhlich Children's Advantage Network v. Nat'l Union Fire Co. of Pittsburgh, PA*, --- N.E.2d ---- (Ill. App. Ct. Feb. 3, 2010) ("[I]f the language in the policy is susceptible to more than one meaning, it is ambiguous and will be construed strictly against the insurer.").  At all events, therefore, my decision in National Union's favor would be the same. I conclude that National Union and Shorenstein are entitled to summary judgment.

**3.  Whether Shorenstein is Covered under the Policy if the Professional Services Exclusion Applies to Eckland's Conduct**

Although the foregoing discussion effectively disposes of the cross-motions between USF&G and National Union, for completeness, I consider National Union's final argument -- namely, that even if Shorenstein's coverage were contingent upon Eckland's coverage under the Policy, Shorenstein would nevertheless remain covered. Here, National Union argues that the professional services exclusion does not entirely deprive Eckland of coverage because Eckland was alleged in the underlying suits to have been negligent in performing at least some non-professional tasks.  For example, National Union points to allegations in the underlying complaints that Eckland failed to ensure that the scaffolding was secured safely, that Eckland was "in charge of the erection, construction,

repairs, alteration, removal and/or caulking." National Union Mem. in Support of Mot. Summ. J. against USF&G at 12-13. Since some of Eckland's conduct was covered under the Policy, National Union argues, Shorenstein is also covered. Furthermore, National Union maintains, "[i]f the facts alleged within the suit fall within, or potentially within, the coverage provisions, then the insurer has a duty to defend the insured in the underlying action." *Id.* at 13 (citing *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1993).

This argument fails because, as already noted, National Union does not seek to be *defended* by USF&G, but instead seeks only indemnification. It is well-settled under Illinois law that the duty to indemnify is much narrower than the duty to defend. *See, e.g.*, *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 819 (7th Cir. 2008) ("An insurer's duty to defend is much broader than its duty to indemnify its insured."); *Hous. Auth. Risk Retention Group, Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 603 (7th Cir. 2004) ("An insurer's duty to defend is much broader than its duty to indemnify."). Specifically, "the duty to indemnify arises *only if* the facts *alleged actually fall within coverage*." *Guillen ex rel. Guillen v. Potomac Ins. Co. of Ill.*, 751 N.E.2d 104, 114 (Ill. App. Ct. 2001); *see also Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 353 F. Supp. 2d 966, 976 (N.D. Ill. 2005). It is solely in connection with the duty to *defend* that an insurer's obligation is triggered where the facts alleged in a suit merely

fall potentially within the terms of the policy. Thus, in order to show that USF&G has a duty to indemnify, National Union would be required to show that Eckland was actually covered by the Policy, not that National Union might be covered under the Policy because it was alleged to have engaged in non-professional conduct.

National Union responds by arguing that since the underlying lawsuits were resolved by way of settlement, the plaintiffs must be presumed to have prevailed on all counts of the complaints. National Union Reply to USF&G (Doc. 215) at 10. National Union premises its argument on *Home Insurance Co. v. Cincinnati Insurance Co.*, 821 N.E.2d 269 (Ill. 2004), which held that "there is a presumption that the injured worker in the underlying suit would have prevailed on all of his theories of liability where the case is settled prior to trial." *Id.* at 281. In light of this presumption, National Union argues, Eckland must be presumed to have engaged in at least some non-professional services.

I disagree. The presumption mentioned in *Home Insurance* is just that -- a presumption. As *Home Insurance* itself makes clear, the presumption can be overcome by the presentation of contrary evidence indicating that the plaintiff would not in fact have prevailed at trial. In *Home Insurance*, there was a complete absence of such countervailing evidence. Indeed, the insurer from whom the plaintiff was seeking indemnification had itself admitted the likelihood that it would have lost at trial. *Id.* at 281-82. Here, by contrast, USF&G points to evidence suggesting that,

-27-

regardless of what the underlying lawsuit might have alleged, Eckland performed only professional services. Thus, for example, in addition to the language of the contract between Eckland and Shorenstein, USF&G also points to testimony from Robert Eckland, Eckland's Chief Executive Officer, and Tom Cashin, Shorenstein's Senior Vice President, stating that Eckland rendered only professional services in connection with the Curtain Wall Project. *See* USF&G Resp. at 11-12. This is of course not to say that USF&G's evidence is conclusive; it is only to say that, given the countervailing evidence, the *Home Insurance* presumption does not provide a sufficient basis for National Union's argument.

In short, I am not persuaded by National Union's contention that it is entitled to coverage based on its claim that Eckland performed non-professional services.

### 4. Shorenstein Entities

In addition to the foregoing arguments, USF&G contends that even if National Union's interpretation is correct and Shorenstein is indeed covered under the USF&G Policy, it does not follow that *all* of the Shorenstein entities are covered. As indicated above, "Shorenstein" is used as an umbrella term for several distinct corporations and partnerships. USF&G maintains that only those entities whose coverage was required under the agreement between Shorenstein and Eckland are covered under the Policy. According to USF&G, the agreement required the coverage of only three Shorenstein entities: Shorenstein Realty Services, L.P.;

Shorenstein Company, L.P.; and SRI Michigan Avenue Venture, LLC. Thus, USF&G claims, the businesses whose coverage was not required under the agreement -- Shorenstein Management, Inc.; Shorenstein Company, LLC; and SRI Michigan Avenue Management, Inc. -- are not covered under the Policy.

While National Union briefly disputes USF&G's contention, its chief position is that deciding the issue at this juncture would be premature. According to National Union, the question concerning which of the Shorenstein entities are covered under the Policy is properly considered during the damages phase of the litigation.

As USF&G explains, this issue was previously broached during a conference call between the parties, and they were unable to reach agreement regarding when it should be addressed. Under the circumstances, I decline to address the matter at this time. To the extent that the parties wish to dispute the question concerning which of the Shorenstein entities are covered under the USF&G policy, they may do so in their briefing on the issue of damages.

### C. USF&G & Mt. Hawley

I turn now to the cross-motions for summary judgment between USF&G and Mt. Hawley. Unlike National Union, which seeks indemnification only for settlement costs it incurred on behalf or Shorenstein, Mt. Hawley seeks equitable subrogation for all of the defense and indemnity payments it made on behalf of the Homeowner's Association. Nevertheless, the Policy at issue in the dispute between USF&G and Mt. Hawley is identical to the one at issue in

the dispute between USF&G and National Union, and the parties'
arguments are essentially the same.  Ordinarily, the overlap
between USF&G's dispute with National Union and its dispute with
Mt. Hawley might obviate the need to consider the cross-motions
individually.  In Mt. Hawley's case, however, USF&G raises the
additional contention that it is entitled to summary judgment
because, unlike National Union, Mt. Hawley failed to reserve its
right to seek equitable relief against USF&G.  I am compelled to
agree.

It is firmly established under Illinois law that "[t]he
failure of a paying insurer to reserve its rights against a
nonpaying insurer may constitute a waiver of the right to equitable
remedies."  *Home Ins.*, 821 N.E.2d at 282 (citing 15 Couch on
Insurance 3d § 218:32 (2004)).  More specifically, Illinois courts
have instructed that "an insurer desiring to reserve its rights
against a second insurer must make this position clear in its
correspondence with the second insurer."  *Id.; see also Chicago
Hosp. Risk Pooling Program v. Illinois State Med. Inter-Ins. Exch.*,
--- N.E.2d ---- (Ill. App. Ct. 2009).  As the Seventh Circuit has
explained:

> Under Illinois law, an insurance company has three
> options if it wishes to dispute coverage for the defense
> of its insured against a third party action: it can
> immediately seek a declaratory judgment of non-coverage,
> provide a defense for the insured under a reservation of
> rights, or completely refuse to do either of the above at
> the peril of being found in breach of its duty to defend.
> Notice that this list does not include the option, "Pay
> for the defense of the insured with an apology and then

> contest coverage later," which is what ICI did here.
> Simply put, if ICI wanted both to pay Seyfarth, Shaw and
> to retain its right to challenge its duty to make that
> payment, it had to get a reservation of rights agreement.
> It did not do so, and, therefore, it waived any argument
> concerning lack of coverage under the policies.

*Ins. Corp. of Ireland, Ltd. v. Bd. of Trustees of S. Ill. Univ.*, 937 F.2d 331, 337 (7th Cir. 1991); *see also Kajima Const. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 856 N.E.2d 452, 459 (Ill. App. Ct. 2006); *Gibraltar Ins. Co. v. Varkalis*, 263 N.E.2d 823, 827 (Ill. 1970).

Here, Mt. Hawley never reserved its rights in an agreement or written correspondence of any kind. And although Mt. Hawley appears to believe that it nonetheless remains entitled to recover against USF&G, it never explains why. At one point, for example, Mt. Hawley claims that "the totality of [the Homeowner's Association's] conduct demonstrates it sought coverage from USF&G as an additional insured." Mt. Hawley Resp. (Doc. 181) at 2. Specifically, Mt. Hawley notes that the Homeowner's Association made tenders of its defense to USF&G in February 2003, and that it made a second tender to USF&G in April 2009. Yet Mt. Hawley never explains how the Homeowner's Association's tenders of defense might constitute a reservation of rights on Mt. Hawley's part.

Similarly, the cases that Mt. Hawley cites in support of its position have little if any relevance to the question whether it has reserved its rights. For example, Mt. Hawley claims that the *Home Insurance* decision "disproves" USF&G's argument. *See* Mt.

Hawley Resp. at 5. This claim is entirely without merit. *Home Insurance* involved a suit brought against Allied Asphalt Paving Company ("Allied"), a general contractor that had entered into agreements with two subcontractors -- Aldridge Electric Company, Inc. ("Aldridge") and Western Industries, Inc. ("Western"). *Home Ins.*, 821 N.E.2d at 272-73. Allied was named as an additional insured under a policy issued to Western by Cincinnati Insurance Company ("Cincinnati") as well as a policy issued to Aldridge by Home Insurance. *Id.* at 273. After it was sued, Allied tendered its defense to both Cincinnati and to Home Insurance. *Id.* Cincinnati agreed to defend Allied, but sent a letter to Allied reserving its rights to deny coverage for any work or conduct not performed by Western on behalf of Allied. *Id.* Home Insurance also agreed to defend Allied; in its acceptance letter, however, it never reserved its rights. *Id.* Instead, it stated that it would share the expense of defending Allied with the "insurance carrier for Western . . . on a 50/50 basis subject to a review of both policies and any reservation of rights." *Id.* (quotation marks omitted). Home Insurance later brought a claim for subrogation against Cincinnati. An Illinois circuit court held that Home Insurance had waived the claim by failing to reserve its rights in agreeing to defend Allied. *Id.* at 274-75. On appeal, the Illinois Supreme Court agreed, explaining:

> an insurer by its conduct may waive rights against
> another insurer. Here, Home was presumed to know the
> contents of its own policy and that it was an excess

insurer. Home claims that it did not know the contents of Cincinnati's policy and whether it also contained an excess clause. However, this should not have stopped Home from informing Cincinnati during the Fisher litigation that it would seek full reimbursement from Cincinnati if its policy did not contain an excess clause. The totality of Home's conduct was inconsistent with any claim that it would seek full reimbursement for the Fisher settlement from Cincinnati. Home accepted Allied's defense without a specific reservation of rights and without asserting that it was an excess insurer. Instead, it only asserted that it would share in the cost of Allied's defense and indemnity with Western on a 50-50 basis.

*Id.* at 282-83.

It is unclear why Mt. Hawley relies on *Home Insurance*. It citing the case, it offers only the cryptic remark that "USF&G is similar to Home and Cincinnati as [the Homeowner's Association] tendered to it and other carries [sic] which covered [the Homeowner's Association] as an additional insured." Mt. Hawley Resp. at 5. But far from supporting Mt. Hawley, *Home Insurance* cuts decisively against it: Home Insurance lost its ability to recover from Cincinnati because it failed to reserve its rights. In the same way, Mt. Hawley is unable to recover from USF&G because it failed to reserve its rights. It is true that the court ultimately awarded Home Insurance $200,000 of the $300,000 amount that it sought to recover from Cincinnati. *Id*. But this was because Home Insurance had specifically requested that if it were found to have waived its rights, the court would nonetheless award Home Insurance a lesser sum on equitable grounds. *Id.* at 283. Mt. Hawley has made no similar request here.

Equally puzzling is Mt. Hawley's reliance on *John Burns*

*Construction Co. v. Indiana Insurance Co.*, 727 N.E.2d 211 (Ill. 2000). There, John Burns Construction Company ("Burns") entered into an agreement with Sal Barba Asphalt Paving, Inc. ("Barba"), under which Barba was to pave a parking lot for Burns. *Id.* at 213. The agreement required Barba to add Burns as an additional insured under Barba's policy with Indiana Insurance Company ("Indiana"). *Id.* An individual later slipped in the parking lot and filed suit against Burns. *Id.* Burns in turn sought defense and indemnification from Indiana and asked its other insurer, Royal Insurance Company ("Royal"), not to become involved. *Id.* Indiana initially refused to defend Burns. *Id.* As a result, Burns was defended by Royal. *Id.* Later, Burns and Royal filed a declaratory judgment action against Indiana, and Indiana agreed that it had a duty to defend and indemnify Burns after all. *Id.* at 213-14. Indiana maintained, however, that Royal was obligated to share the costs equally, since the Indiana policy contained an "other insurance" provision that allowed it to seek contribution from other insurers. *Id.* at 214. The Illinois Supreme Court disagreed and held that Burns had the right to choose whether to rely on the Indiana policy or the Royal policy. *Id.* at 215.

Again, it is unclear why Mt. Hawley should think that *John Burns* supports its position. Mt. Hawley cites *John Burns* for the proposition that "when as here an insured makes a target tender, insurance referenced in an 'other insurance' provision becomes unavailable. A target tender may be made at any time." Mt. Hawley

Resp. at 6 (citation omitted).  Once more, however, Mt. Hawley
fails to develop any argument as to how any of this suggests that
it reserved its rights against USF&G.

Mt. Hawley offers only one further argument -- namely, that
USF&G itself has waived its right to raise any waiver argument.
This argument, too, is without merit.  Mt. Hawley correctly points
out that waiver is an affirmative defense and that it is waived if
it is not asserted in a party's answer or subsequent motion to
dismiss.  However, Mt. Hawley is plainly incorrect in claiming that
USF&G failed to raise the waiver defense.  On the contrary,
"waiver" is among the affirmative defenses included in USF&G's
answer to the Homeowner's Association's counter-complaint.  *See*
USF&G's Ans. to Counter-Plaintiff Mt. Hawley Counter-Complaint
(Doc. 82) at 13.  It is true, as Mt. Hawley notes, that USF&G did
not assert the waiver argument as part of its previous motion for
summary judgment in this case.  However, Mt. Hawley cites no
authority for the proposition that an affirmative defense that has
been asserted in an answer is nonetheless waived if it is not
asserted again in the first of multiple subsequent summary judgment
motions.  On the contrary, the Seventh Circuit has clearly stated
that a delay in asserting an affirmative defense is a basis for
waiver only where the delay is prejudicial to the opposing party.
*See, e.g., Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir.
2009).  Mt. Hawley has offered no convincing reason why it would be
unfairly prejudiced by USF&G's invocation of the waiver defense at

this point in the litigation.

In light of these circumstances, I am constrained to deny Mt. Hawley's motion for summary judgment and to grant USF&G's counter-motion.

**D.    National Union & AMICO:**

Lastly, I turn to the cross-motions for summary judgment between National Union and AMICO.  The facts at issue in the dispute between National Union and AMICO run strictly parallel to those in National Union's dispute with USF&G: Shorenstein entered into an agreement with McGinnis Chen & Associates, LLP ("MCA"), an architecture and engineering firm, to work on the Curtain Wall Project at the Hancock Center.  As with the Eckland agreement, Shorenstein's agreement with MCA required MCA to procure an insurance policy that covered Shorenstein as an additional insured. MCA obtained a Premier Businessowners Policy ("the Premier Policy") and a Commercial Catastrophe Policy (together, "the AMICO Policy") from AMICO.  Like the USF&G Policy, the AMICO Policy incorporated a professional services exclusion.  In relevant part, the Premier Policy provides:

This Insurance Does Not Apply to . . .

**j. Professional Services**

"Bodily injury," "property damage," "personal injury" or "advertising injury" due to rendering or failure to render any professional service.  This includes but is not limited to . . .

2) Preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change

orders, designs or specifications;

3) Supervisory, inspection or engineering services[.]

AMICO Premier Policy, AMICO L.R. 56.1 Stmt., Ex. 2 (Doc. 175-2) at MCA111587-MCA111588.[7]

In addition, the AMICO Policy includes a "Separation of Insureds" provision, which provides:

**LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS**

5.  Separation of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this policy to the first Named Insured, this insurance applies:

a.  As if each Named Insured were the only Named Insured; and

b.  Separately to each insured against whom claim is made or "suit" is brought.

AMICO Premier Policy at MCA111596.

Unlike USF&G, AMICO did not reject Shorenstein's tender of defense; instead, it initially defended Shorenstein under a reservation of rights. When the cases settled, however, AMICO invoked the professional services exclusion and refused to make payments on Shorenstein's behalf. As a result, Shorenstein's contributions to the settlement were made by National Union. National Union now seeks equitable subrogation from AMICO.

_____

[7] The Catastrophic Policy also contains a professional services exclusion. *See* AMICO Catastrophic Policy, AMICO L.R. 56.1 Stmt., Ex. 3 (Doc. 175-2) at MCA111516. While worded slightly differently from the Premier Policy provision, the two provisions are functionally the same.

AMICO's argument for refusing to indemnify Shorenstein is essentially the same as that advanced by USF&G: according to AMICO, the Policy excludes coverage for professional services; MCA's work consisted solely of professional services; MCA's work was not covered under the AMICO Policies; therefore, Shorenstein was not covered under the AMICO Policies.

A key premise of AMICO's argument is that Shorenstein is covered under the Policy only to the extent that MCA is covered. Unfortunately, AMICO fails to offer any argument for this proposition. *See* AMICO Mem. in Support Mot. Summ. J. (Doc. 173) at 6, 10, 12; AMICO Resp. Br. (Doc. 190) at 1;[8] AMICO Reply (Doc. 207) at 3. Indeed, in the three separate briefs that it has submitted in connection with the cross-motions for summary judgment, AMICO fails to so much as cite any provision of the AMICO Policy in support of its position.

It is true that the Policy contains an Additional Insureds clause, which might be thought to support AMICO's position. The provision states:

**5. Additional Insureds -- By Contract, Agreement or Permit**

Any person or organization to whom or to which you are obligated by virtue of a written contract, agreement or permit to provide such insurance as afforded by this policy is an insured, but only with respect to liability arising out of:

---

[8] AMICO's Response Brief does not include page numbers. As a result, I cite to the CM/ECF page numbers.

a. "Your work" for that insured by you[.]

AMICO Premier Policy at MCA111594.

Against this, however, National Union argues that the Additional Insureds provision must be read in concert with the Separation of Insured provision, which, as noted above, requires that the Policy be applied "[s]eparately to each insured against whom claim is made or 'suit' is brought." Premier Policy at MCA111596. Moreover, National Union points out that, as with the USF&G Policy, AMICO's interpretation would render Shorenstein's coverage illusory: if Shorenstein were covered only for liability arising out of MCA's performance of professional services, and at the same time, the professional services exclusion precluded coverage for liability arising out of MCA's performance of professional services, the AMICO Policy would essentially take away with one hand what it gives with the other.

Ignoring all of these issues, AMICO hangs its hat on a single argument, based on the appearance of the word "any" in the professional services exclusion. Specifically, AMICO argues, "because the policy excludes claims arising of out 'any' professional services, the exclusion applies to preclude for coverage for all claims arising out of MCA's professional services." AMICO Resp. at 4-5.

The exclusion's text simply does not support -- much less *require* -- AMICO's sweeping interpretation. The "any" in the exclusion modifies "professional service" and simply means that the

exclusion applies regardless of the type of professional service in question.  "Any professional service" does *not* mean that the exclusion applies to any claim or any party that is in any way related to the performance of professional services of any kind. In other words, the exclusion is most naturally interpreted as providing that MCA is not covered for liability arising out of its performance of professional services of any kind; the exclusion does not mean that other parties, such as Shorenstein, are without coverage for any claims against them that are in some way related to MCA's professional services.

As in the case of the professional services exclusion in the USF&G Policy, National Union's interpretation of the AMICO Policy's professional services exclusion is supported not only by the text of the provision, but also by the fact that, under AMICO's alternative interpretation, Shorenstein's coverage is essentially a dead letter.  Like Eckland, Shorenstein hired MCA specifically to perform professional services.  If the AMICO Policy provides Shorenstein with no coverage for any claim arising out of MCA's performance of professional services, it would provide Shorenstein with virtually no coverage.

As the party denying coverage, AMICO bears the burden of showing that the professional services exclusion is applicable. *See, e.g.*, *Ins. Corp. of Hanover v. Shelborne Assocs.*, 905 N.E.2d 976, 982 (Ill. App. Ct. 2009) ("It is the insurer's burden to affirmatively demonstrate the applicability of an exclusion.")

(quotation marks omitted). Moreover, as noted above, "provisions that limit or exclude coverage must be construed liberally in favor of the insured and against the insurer." *Id.* (quotation marks omitted). Based on the foregoing considerations, AMICO has failed to show that the professional services exclusion bars Shorenstein's coverage in connection with the underlying suits. As I observed in the case of National Union's dispute with USF&G, National Union is entitled to summary judgment against AMICO even if National Union's interpretation of the AMICO Policy is not the only possible interpretation. So long as National Union's interpretation is a reasonable one -- and I conclude that it is -- the fact that there are other reasonable interpretations would mean only that the Policy was ambiguous. Since ambiguities are construed against the drafter, a finding that the AMICO Policy was ambiguous would still require summary judgment in favor of National Union.

For these reasons, National Union's motion for summary judgment against AMICO is granted, and AMICO's cross motion against National Union is denied.

### III. Conclusion

For the reasons explained above, I grant National Union's motion for summary judgment against USF&G and I deny USF&G's cross-motion against National Union; I grant USF&G's motion for summary judgment against Mt. Hawley and deny Mt. Hawley's cross-motion against USF&G; and I grant National Unions's motion for summary judgment against AMICO and deny AMICO's cross-motion against

National Union.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Date: March 25, 2010