**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY,<br><br>    Plaintiff,<br><br>        v.<br><br>SHORENSTEIN REALTY SERVICES, L.P.; SHORENSTEIN MANAGEMENT, INC.; SHORENSTEIN COMPANY, LLC; SRI MICHIGAN VENTURE, LLC; SRI MICHIGAN AVENUE MANAGEMENT, INC.; 175 EAST DELAWARE PLACE HOMEOWNERS ASSOCIATION; and NATIONAL UNION FIRE INSURANCE OF PITTSBURGH, PA,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   No. 07 C 3179<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA; SRI MICHIGAN AVENUE
VENTURE, LLC; SHORENSTEIN REALTY
SERVICES, L.P.; SHORENSTEIN MANAGEMENT,
INC.; SRI MICHIGAN AVENUE MANAGEMENT,
INC.; and SHORENSTEIN COMPANY, LLC,

    Defendants/Counter-Plaintiffs,

        v.

UNITED STATES FIDELITY AND GUARANTY
COMPANY,

    Plaintiff/Counter-Defendant.

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA; SRI MICHIGAN AVENUE
VENTURE, LLC; SHORENSTEIN REALTY
SERVICES, L.P.; SHORENSTEIN MANAGEMENT,
INC.; SRI MICHIGAN AVENUE MANAGEMENT,
INC.; and SHORENSTEIN COMPANY, LLC,

    Defendant/Third Party Plaintiffs,

        v.

AMERICAN MOTORISTS INSURANCE COMPANY,

    Third Party Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

This court has already granted summary judgment to SRI Michigan Avenue Venture, LLC, SRI Michigan Avenue Management, Inc., Shorenstein Realty Services, L.P., Shorenstein Management, Inc. and Shorenstein Company, LLC (collectively "Shorenstein") and National Union Fire Insurance Company of Pittsburgh, PA ("National Union") on the grounds that Shorenstein was insured under the policies issue by United States Fidelity & Guaranty Company ("USF&G") and American Motorists Insurance Company ("AMICO"). Shorenstein and National Union have moved for summary judgment on damages, as well as on the issue of which Shorenstein entities are covered under the USF&G and AMICO policies. USF&G filed a cross-motion for summary judgment, which was joined by AMICO. For the reasons that follow, Shorenstein and National Union's motion is granted in part and denied in part, and USF&G and AMICO's cross-motion is denied.

### I.

This case centers around a tragic accident which took place on March 9, 2002 at the John Hancock Center in Chicago, Illinois. SRI Michigan Avenue Venture, LLC was the owner of the property and Shorenstein Realty Services, L.P. was the manager of the property. This accident happened in connection with a project for which Shorenstein had retained Eckland Consultants, Inc. ("Eckland"), which held a Business Foundation Policy from USF&G with primary and umbrella coverage parts. The USF&G policy had primary limits of $1

2

million and excess limits of $5 million. On the same project, Shorenstein retained McGinnis Chen & Associates, LLP ("MCA"), which was insured by AMICO under a Premier Businessowners Policy (the primary policy) and a Commercial Catastrophe Policy (the excess policy). The AMICO primary policy had a limit of $1 million and the excess policy had a limit of $5 million. In its contracts with Eckland and MCA, Shorenstein required that Eckland and MCA procure coverage for certain Shorenstein entities as additional insureds. Shorenstein itself held coverage that included a $1 million primary policy from The Hartford Fire Insurance Company and a $25 million excess policy from National Union.

AMICO originally agreed to defend Shorenstein under a reservation of rights in the underlying state lawsuit but subsequently refused to indemnify Shorenstein. USF&G refused to defend or indemnify Shorenstein. Ultimately, National Union paid $7,678,928.10 toward the settlement of the underlying lawsuit.

## II.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party shows that there is no genuine issue of material fact, the burden of proof shifts to the nonmoving party to

3

designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Shorenstein and National Union argue that National Union is equitably subrogated[1] to Shorenstein's rights against USF&G and AMICO. Under Illinois law, a party asserting equitable subrogation must show: (1) the defendant carrier must be primarily liable to an insured under a policy of insurance; (2) the plaintiff carrier must be secondarily liable to the insured for the same loss under its policy; and (3) the plaintiff carrier must have discharged its liability to the insured and at the same time extinguished the liability of the defendant carrier. *See Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 280 (Ill. 2004).[2] Shorenstein and National Union assert that all three elements are met here.

A threshold issue presented by both motions for summary judgment centers on which of the Shorenstein entities listed in the

---

[1] In its response, USF&G argues that National Union can only be contractually, not equitably, subrogated to the rights of various Shorenstein entities due to language in the National Union policy. Shorenstein and National Union respond that only equitable subrogation is possible because there is no direct contractual relationship between National Union and USF&G/AMICO. I need not resolve this issue as the elements which must be proven under either equitable or contractual subrogation are materially the same. *See Wausau Inc. Co. v. All Chicagoland Moving & Storage Co.*, 777 N.E.2d 1062, 1067 (Ill. App. Ct. 2002).

[2] As has been the case in the prior motions filed in this case, none of the parties engages in a choice of law analysis and assume that Illinois law governs this dispute. Since none of the parties challenges the application of Illinois law, I shall apply Illinois law as well. *See, e.g.*, *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

settlement of the underlying state lawsuit are covered by the USF&G and/or AMICO insurance policies.[3] I start by looking at which entities were named as defendants in the underlying consolidated lawsuit. The Shorenstein defendants were: (1) Shorenstein Realty Services, L.P.; (2) SRI Michigan Avenue Venture, LLP; (3) Shorenstein Management, Inc.; and (4) SRI Michigan Avenue Management, Inc. However, when the parties settled the underlying lawsuit, the Settlement Agreement listed the following eight parties: (1) Shorenstein Realty Services, LP; (2) SRI Michigan Avenue Venture, LLP; (3) Shorenstein Management, Inc.; (4) SRI Michigan Avenue Management, Inc.; (5) Shorenstein Co., LP; (6) Shorenstein Company LLC; (7) Shorenstein Properties LLC; and (8) Shorenstein Michigan Avenue Venture LLC. Therefore, in addition to the four Shorenstein defendants in the underlying lawsuit, there were four additional Shorenstein entities listed in the Settlement Agreement.

Shorenstein and National Union argue that there were really only two true defendants in the underlying lawsuit -- owner SRI Michigan Avenue Venture, LLC and property manager Shorenstein

---

[3]     USF&G and AMICO argue that the requirements for coverage under their policies have not been shown because National Union has failed to put forward evidence that all primary insurance available to Shorenstein must be exhausted. USF&G/AMICO Opp. (#306) at 4. Shorenstein and National Union respond that this argument has been waived as it should have been, but was not, raised in the earlier motions for summary judgment related to coverage. I agree that this argument should have been raised earlier as it relates to coverage and I find it waived.

Realty Services, L.P. -- and that only those two parties were truly released in the Settlement Agreement. With respect to the complaint in the underlying lawsuit, Shorenstein and National Union argue that although the fifth and sixth amended complaints name four Shorenstein entities, only SRI Michigan Avenue Venture, LLC and Shorenstein Realty Services, L.P. were potentially liable to plaintiffs. In support, Shorenstein and National Union point out that only these two entities filed appearances in the case and Shorenstein filed an answer and other documents with the following language: "Shorenstein Realty Services, L.P. ("SRS") and SRI Michigan Avenue Venture, LLC ("SRI") (individually and as improperly sued herein as Shorenstein Management, Inc., SRI Michigan Avenue Venture, LLP, Shorenstein Co., L.P. and SRI Michigan Avenue Management, Inc.)" Shor./Nat'l Union RSODF Ex. E. Through this phrasing, Shorenstein was alerting the state court to the fact that the property owner, SRI Michigan Avenue Venture, LLC, was incorrectly sued as an LLP, and also asserting that the entities Shorenstein Management, Inc. and Shorenstein Co., L.P. were improperly named as defendants. Shorenstein and National Union also point to the deposition testimony of Shorenstein Rule 30(b)(6) witness, attorney George B. Yankwitt, who, when asked about which Shorenstein entities were potentially at risk in the underlying lawsuit, stated, "I suppose that by naming entities in a complaint someone is making a claim against those entities. On

the other hand, I don't recall a single communication with Mr. Clifford or any other attorney representing any plaintiff in any lawsuit in which anyone ever suggested that any entity other than the owner of the commercial portion of the Hancock, SRI Michigan Avenue Venture LLC, or Shorenstein Realty Services had any liability to any of the plaintiffs." USF&G SUF Ex. G, Yankwitt Dep. at 83:8-18. He then went on state that "the subject of whether any other entities had potential liability" "was not discussed" with any of the plaintiffs' lawyers or with any representatives of any of the insurance carriers. *Id*. at 83:19-25, 84:1-18.

Turning then to the eight Shorenstein entities listed in the Settlement Agreement, Shorenstein and National Union argue that because only SRI Michigan Avenue Venture, LLC and Shorenstein Realty Services, L.P. had any possible liability in the underlying lawsuit, only these two parties were truly released by the settlement. Shorenstein and National Union explain that the four additional Shorenstein entities (which were not even defendants in the underlying action) were included in the Settlement Agreement in an attempt to be "as overly inclusive as possible." Shor./Nat'l Union Mem. (#296) at 12. They argue that the "the parties first agreed on a settlement figure for the Shorenstein defendants, and then an attorney for the plaintiffs sent a draft release to Mr. Yankwitt and Mary Chang at Bryan Cave, having filled in the names

of Shorenstein entities named as defendants, and asking them to fill in any other names they wished." *Id*.

In response, USF&G argues that all eight Shorenstein entities listed in the Settlement Agreement were potentially liable to the plaintiffs. *See* USF&G Mem. (#296) at 9. AMICO makes a different argument and maintains that only the four Shorenstein entities which were defendants in the underlying action could possibly be at risk in that suit, and could possibly trigger coverage.

For guidance, I turn to *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d 357 (7th Cir. 1990), which involved two underlying securities lawsuits. One action named Continental Bank and five of its directors as defendants. The other named Continental Bank and 25 directors, officers and employees identified only as John Does. Continental settled the two cases and sought reimbursement of $15 million from insurer Harbor and the remaining $2.5 million from Allstate. The Seventh Circuit remanded the case back to the district court for a new trial and, in so doing, discussed in dicta the issue of damages. The Seventh Circuit considered the possibility that some portion of the $17.5 million settlement was attributable to individuals or activities that were not insured under the D&O policy. The court stated, "To the extent that the amount for which Continental settled was larger than it would have been but for the misfeasance of these other people-either noninsured persons or persons against whom no claim

was made-Continental's entitlement to reimbursement in this suit would be cut down." *Id.* at 367.

Admittedly, the language in *Harbor Insurance* quoted above is dicta, and the instant case does not involve directors and officers of a company. Despite this, *Harbor Insurance* is analogous to the instant case in that both cases involve a settlement where some parties are insured and some are not.[4] Shorenstein and National Union have put forward undisputed evidence that attorneys for the plaintiffs and Shorenstein reached a "handshake" deal in which the parties agreed to settle for a certain amount. USF&G SUF Ex. G, Yankwitt Dep. at 73-74. After this agreement was reached, one of the plaintiffs' attorney's sent Shorenstein's attorneys Mary Chang and George Yankwitt "a draft of the general release with a request that we fill in the names of the entities what we want released." *Id.* Yankwitt also testified that the plaintiffs' attorney sent Mary Chang and Yankwitt "a draft of the Release and a request that we fill in the names of the Shorenstein entities that we wanted to be beneficiaries of the release. I do not -- I believe that what [the plaintiffs' attorney] sent was a marked up copy of the release he had used with AMS. I believe that he had already filled in the names of the entities that were named as Defendants in the

---

[4] I recognize that it is undisputed that National Union represented all the Shorenstein entities listed in the Settlement Agreement. However, from USF&G and AMICO's perspective, some of those Shorenstein entities were covered by policies issued by USF&G and/or AMICO, and some were not.

underlying lawsuits, and he was saying that if you want anyone else specifically named, add them." *Id*. at 87-88. Finally, Yankwitt testified that the plaintiffs' attorneys "did not care one wit[sic]" which entities Chang and Yankwitt included in the Settlement Agreement. *Id*. at 93. USF&G and AMICO have offered no evidence that the addition of the four non-defendant Shorenstein entities increased the amount of the settlement.

In light of this undisputed evidence, I conclude that the four Shorenstein entities which were not listed as defendants in the underlying suit should not be considered in the allocation analysis. Their addition to the Settlement Agreement did not increase the settlement amount. *See Harbor Insurance*, 922 F.2d at 367.

Turning then to the question of whether all four Shorenstein entities listed as defendants in the underlying lawsuit should be considered at risk for liability (or whether only the owner and the property manager should), I conclude that all four entities listed as defendants in the underlying lawsuit were potentially liable in the underlying lawsuit. The law in Illinois presumes that the underlying plaintiffs would have prevailed on all of their theories of liability because the case settled prior to trial. *See Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 281 (Ill. 2004). Thus, I must assume all four Shorenstein defendants were subject to liability in the underlying lawsuit. I reject Shorenstein and

National Union's argument that Shorenstein's assertion in the pleadings that Shorenstein Co., L.P. and Shorenstein Management, Inc. were improperly named as defendants overcomes this presumption. Nor do I conclude that Yankwitt's deposition testimony establishes that these two parties were not potentially subject to liability. Yankwitt admitted that "I suppose that by naming entities in a complaint someone is making a claim against those entities." USF&G SUF Ex. G, Yankwitt Dep. at 83. Through six amended complaints, the plaintiffs in the underlying action continued to list Shorenstein Co., L.P. and Shorenstein Management, Inc. as defendants. SRI Michigan Avenue Venture, LLC and Shorenstein Realty Services, L.P. never moved to dismiss the other Shorenstein defendants and thus all four Shorenstein entities were defendants at the time of settlement. Thus, all four were potentially liable to plaintiffs.

I now must determine which of the four Shorenstein defendants who are also listed in the Settlement Agreement are covered under USF&G and/or AMICO's policies. These four Shorenstein entities are: (1) Shorenstein Realty Services, L.P.; (2) SRI Michigan Avenue Venture, LLP; (3) Shorenstein Management, Inc.; and (4) SRI Michigan Avenue Management, Inc.

The USF&G policy insured the following: (1) Owner; (2) Shorenstein Realty Services, L.P.; (3) Shorenstein Company, L.P.; and (4) any other party specified by the Owner as an

11

additional insured. *See* USF&G Exs. A, B. The contract between Eckland and Shorenstein lists the Owner as "SRI Michigan Avenue Venture, LLP % Shorenstein Realty Services, L.P.", while a letter from Shorenstein to Eckland states that the USF&G Policy must list "SRI Michigan Avenue Venture, LLC (Owner)" as an additional insured. *See id.* at Exs. B, C.

The AMICO policy insured the following: (1) Owner; (2) Owner's Agent; (3) Shorenstein Company, LP; and (4) any other party specified by the Owner as an additional insured.

It is undisputed that Shorenstein Realty Services, L.P. is an insured under the USF&G policy. However, I conclude that Shorenstein Realty Services, L.P. is not an insured under AMICO's policy. That entity is not listed as an additional insured in the contract between AMICO and MCA. Further, the contract does not identify which entity is the "Owner's Agent" and there is no indication in the contract itself that Shorenstein Realty Services, L.P. is the "Owner's Agent."[5]

---

[5] In a single sentence, Shorenstein and National Union argue that a MCA project manual identifies Shorenstein Realty Services, L.P. as the "owner's agent," and thus the reference to "Owner's Agent" in the MCA/Shorenstein contract must also refer to Shorenstein Realty Services, L.P. This argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (perfunctory and undeveloped arguments are waived). Shorenstein and National Union make no effort to provide any argument or case law to support this assertion. Ultimately, their argument that it would be proper to interpret one contract by reference to a totally separate document is totally unsupported. Likewise, Shorenstein's assertion that George Shorenstein's deposition supports the notion that Shorenstein Realty Services, L.P. should be deemed to be the

The biggest contention between the parties centers around "LLC" versus "LLP." It is undisputed that the owner of the property at the time of the accident was SRI Michigan Avenue Venture, LLC. In the underlying lawsuit, the plaintiffs improperly named the owner as an LLP and this mistake was repeated by the plaintiffs' attorneys when they carried over the names from the case caption to the text of the Settlement Agreement. USF&G and AMICO both argue that they insure SRI Michigan Avenue Venture, LLC and not the LLP. I note that this confusion between LLC and LLP is repeated in the USF&G/Eckland contract where the owner is identified as an LLP and later changed to an LLC pursuant to a letter from Shorenstein making this correction.

I am not persuaded by USF&G and AMICO's argument. Their argument would be much more compelling if, in fact, there was evidence that SRI Michigan Avenue Venture, LLP actually existed. The undisputed testimony from attorney George Yankwitt indicates that the property owner was "sometimes incorrectly" referred to as an LLP, and testified that he did not know if there ever was an entity whose correct name was SRI Michigan Avenue Venture, LLP.

---

"Owner's Agent" is likewise waived. *See id.* Shorenstein provides no pin cites and instead refers generally to the entire deposition. It is not the job of this court to scour evidence and find support for a party's assertion. In addition, Shorenstein fails to provide any legal authority for the notion that I may use deposition testimony to define "Owner's Agent" in the MCA/Shorenstein contract. It is Shorenstein and National Union's job to fully develop any argument they attempt to present to this court.

USF&G SUF Ex. G., Yankwitt Dep. at 43. As discussed above, attorneys for Shorenstein in the underlying action corrected the owner's name from an LLP to an LLC in all the pleadings they filed. Further, the state court, in finding that the settlement was reached in good faith, entered an order in which it acknowledged that the owner was incorrectly sued as an LLP. Neither USF&G or AMICO argue that they were somehow confused or did not understand that the owner of the property was being sued in the underlying lawsuit.[6] Given the pleadings and orders in the state court case, the testimony concerning the confusion between the entity's status as an LLP or an LLC, and the fact that there only ever was one entity which owned the property, I conclude that the party which was sued in the underlying complaint and was a part of the Settlement Agreement was an insured under both the USF&G and AMICO policy, despite being incorrectly identified as an LLP.

With this in mind, I turn to the issue of targeted or selective tender. Under the targeted tender rule, when several insurance policies are available to the insured, the insured has the paramount right to choose or knowingly forego an insurer's participation in a claim. *See John Burns Constr. Co. v. Indiana*

---

[6] I note that AMICO was involved in providing a defense to Shorenstein in the underlying lawsuit and must have been aware that Shorenstein asserted that the owner was in fact an LLC, not an LLP. I also note that USF&G's policy actually repeated the mistake made by the plaintiffs in the underlying lawsuit in that it, too, originally identified the "Owner" as an LLP. *See* USF&G SUF Ex. B.

*Ins. Co.*, 727 N.E.2d 211, 215 (Ill. 2000). An insured's ability to forego an insurer's assistance should be protected. *See Cincinnati Cos. v. West American Ins. Co.*, 701 N.E.2d 499, 503 (Ill. 1998). When an insured has knowingly chosen to forego an insurer's assistance, the insurer is relieved of its obligation to the insured with regard to that claim. *Id.* at 503-04. The targeted insurer, then, has the sole responsibility to defend and indemnify the insured. *Chicago Hosp. Risk Pooling Program v. Ill. State Med. Inter-Insurance Exch.*, 758 N.E.2d 353, 357 (Ill. 2001). That insurer may not seek equitable contribution from the other insurers that were not designated by the insured. *See Cincinnati Cos.*, 701 N.E.2d at 503.

Shorenstein and National Union have presented evidence that Shorenstein informed both USF&G and AMICO that it selected USF&G and AMICO (among others) to participate in Shorenstein's defense and indemnification and relieved National Union of its obligations. *See* USF&G SUF Exs. N, O. USF&G and AMICO do not dispute the target tender letters, but rather argue that they were somehow suspect or invalid because the tenders were "orchestrated by" National Union. Further, USF&G and AMICO argue that Shorenstein never "deactivated its coverage with" National Union.

First, the issue of Shorenstein's motivation is a non-starter. Illinois courts have recognized that an insured may base its decision to target one insurer over another for any number of

reasons, including a desire to avoid increased premiums or to avoid being dropped as an insured in the future. *See Cincinnati* Cos., 701 N.E.2d at 1311. USF&G and AMICO provide no authority supporting the position that an insured must make its decision to target tender independent of any influence by the insurer not targeted.

Second, I reject USF&G's argument that Shorenstein never "deactivated its coverage" with National Union. Shorenstein and National Union have presented evidence that Shorenstein informed USF&G and AMICO that Shorenstein was choosing them to defend it and Shorenstein informed USF&G and AMICO that it was foregoing coverage from National Union. Further, there is evidence that Shorenstein informed National Union of the same. A July 17, 2002 letter from Chuck Fendrich (on behalf of Shorenstein Management, Inc., Shorenstein Realty Services, L.P. and SRI Michigan Avenue Venture, LLC) to Eckland and MCA, stated:

> Please be advised that I have caused notice to be given to Shorenstein's insurance agent, Marsh USA, Inc., as well as its primary general liability insurance carrier, The Hartford Fire Insurance Company ("Hartford"), and each of its excess general liability carriers, that *Shorenstein does not wish to have Hartford or its excess liability carriers provide for the defense or indemnification of these claims at this time.* Any attempt by you to assert concurrent coverage with Hartford or any of Shorenstein's insurance carriers based on a comparison of the applicable policy language is contrary to the specific intention of Shorenstein in looking to you and/or your insurance carrier(s) for the cost of defense and full indemnity of this matter at this time. *See Institute of London Underwriters v. The Hartford Insurance Co.*, 599 N.E.2d 1311 (1st Dist. 1992).

16

USF&G SUF Exs. N, O (emphasis added). In response to these letters, USF&G and AMICO argue that there is no evidence that Shorenstein ever notified National Union of its "deactivation." I reject this argument as both July 17, 2002 letters indicate that copies of both letters were sent to National Union. *Id.* (showing that National Union was carbon copied on both letters).[7]

The fact that Shorenstein kept National Union on "stand by," ready to step in should USF&G and AMICO refuse to defend or indemnify Shorenstein, does not negate the original targeted tender of USF&G and AMICO.[8] Many Illinois cases, including *John Burns*, cited by USF&G and AMICO, support the notion that an insured does

---

[7] While not explicit, USF&G appears to argues that any targeted tender was negated because the Settlement Agreement did not specifically state that National Union was participating in the settlement because of USF&G and AMICO's failure to participate. First, *Statewide Ins. Co. v. Houston Gen. Ins. Co.*, 920 N.E.2d 611 (Ill. App. Ct. 2009) did not hold that such a statement is *required*. Further, as Shorenstein and National Union rightly point out, the Settlement Agreement contained a reservation of rights in which Shorenstein and National Union reserved their rights to seek reimbursement from "any insurer or potential insurer" of Shorenstein, which would include USF&G and AMICO. In addition, USF&G speculates that Shorenstein would never have given up National Union's $25 million coverage and rely exclusively on USF&G's $6 million coverage. This argument is directly contradicted by the July 17, 2002 letters cited above in which Shorenstein makes clear that it wished to target USF&G and AMICO and relinquish coverage by National Union.

[8] USF&G argues that Shorenstein was obligated to re-assert their targeted tender intentions in a Settlement and Defense Agreement it entered into with various carriers. This argument is waived as unsupported. *See Berkowitz*, 927 F.2d at 1384. USF&G provides no legal authority for its proposition that Shorenstein was obligated to reiterate its position on targeted tender.

not negate an earlier tender by asking a different insurer (which the insured previously released from its obligations) to step in should the targeted insurers fail to act. *John Burns*, 727 N.E.2d at 217(insured's own insurance company defended insured only after targeted insurance company refused to represent insured); *Alcan United, Inc. v. West Bend Mut. Ins. Co.*, 707 N.E.2d 687, 694 (Ill. App. Ct. 1999) (after insured sought exclusive coverage from insurer West Bend and deactivated its tender to another insurer, Reliance, Reliance's duty was "to provide standby coverage in the event West Bend refused tender"); *Legion Ins. Co. v. Empire Fire and Marine Ins. Co.*, 822 N.E.2d 1 (Ill. App. Ct. 2004) (after insured deactivated tender to insurer Empire, Empire's "duty to [the insured] was then only to provide standby coverage in the event [the targeted insurer] refused to defend"); *Chicago Hosp. Risk*, 925 N.E.2d at 1235 (stating that targeted tender "is not negated merely by an expressed desire to keep the deactivated insurer on notice as standby coverage in the event that the selected insurer refuses the tender").

I now turn to the actual calculation of damages. As explained above, USF&G insured two entities in the settlement and AMICO insured one. Dividing the total settlement amount paid by National Union ($7,678,928.10) by the four Shorenstein defendants equals $1,919,732.03 per entity. Thus, the $1,919,732.03 allocated to Shorenstein Realty Services, L.P. must be paid by USF&G. The

$1,919,732.03 allocated to SRI Michigan Avenue Venture, LLC is shared by USF&G and AMICO, with each party responsible for $959,866.02. Therefore, AMICO owes National Union $959,866.02 and USF&G owes National Union $2,879,598.05.[9]

Finally, Shorenstein and National Union ask me to award prejudgment interest at a rate of 5% under the Illinois Interest Act, 815 ILCS 205/2. Section 2 provides: "Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing." Prejudgment interest is available for sums due on insurance policies. *See Couch v. State Farm Ins. Co.*, 666 N.E.2d 24, 27 (1996). The decision to award prejudgment interest is within the trial court's sound discretion. *See Statewide Ins. Co. v. Houston Gen. Ins. Co.*, 920 N.E.2d 611, 624 (Ill. 2009). Interest may accrue when the amount due becomes liquidated, i.e. "due and capable of exact computation." *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 355 (7th Cir. 2010) (quoting *Conway v. Country Caves. Ins. Co.*, 442 N.E.2d 245, 250 (Ill. 1982)). "A sum is liquidated if calculation

---

[9] None of the parties dispute that Shorenstein's primary insurer, Hartford, paid its $1 million policy to fund the settlement of the underlying lawsuit. In addition, none of the parties discuss that policy, any targeted tender issues related to Hartford or how that payment may or may not impact my ruling with respect to USF&G and AMICO. In light of this, I conclude that the parties have waived any argument with respect to Hartford and have proceeded with my analysis with the understanding that the Hartford policy is irrelevant to these motions.

does not require 'judgment, discretion or opinion." *Id.* (quoting *Dallis v. Don Cunningham & Assoc.*, 11 F.3d 713, 719 (7th Cir. 1993)). However, "a good faith defense to liability does not bar prejudgment interest if the amount is ascertainable." *Id.*

After considering all the relevant facts, I decline to award prejudgment interest. Clearly, the amount of money paid by National Union to settle the underlying lawsuit was "liquidated." However, given the complexities of this case, including the fact that not all of the parties listed in the settlement were defendants and not all of the entities were insureds of USF&G and AMICO, I cannot conclude that the amount USF&G and AMICO owed was "subject to an easy determination by calculation or computation." *Couch*, 666 N.E.2d at 27. This is not a case like *New Hampshire v. Hanover*, 696 N.E.2d 22, 28 (Ill. App. Ct. 1998), where the plaintiff insurer was seeking reimbursement from another insurer for the amount plaintiff paid to settle a lawsuit, and "there was no dispute that the amount due was $450,000."

### III.

Shorenstein and National Union have demonstrated that National Union is subrogated to Shorenstein's rights against USF&G and AMICO as described herein. For all the foregoing reasons, Shorenstein and National Union's motion for summary judgment is granted in part and denied in part. USF&G and AMICO's cross-motion for summary judgment is denied.

20

**ENTER ORDER:**


_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 11, 2011